# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### SOUTH BEND DIVISION

| | | |
|---|---|---|
| D. SCOTT LOVE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Cause No.: 3:14-CV-2039 |
| | ) | |
| PENN-HARRIS-MADISON SCHOOL | ) | |
| CORPORATION, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

This matter is before the court on the motion for partial summary judgment filed by

Defendants Sergeant Eric Kaser,[1] Sergeant John Kuhny, Sheriff Mike Grzegorek, and St. Joseph

County Board of Commissioners (DE 23).[2] The Defendants filed a brief in support of their

motion (DE 24), Plaintiff D. Scott Love filed a brief in opposition to the motion (DE 42), and

Defendants filed a reply brief (DE 46). For the reasons set forth below, the motion for partial

summary judgment is GRANTED as to all of the Plaintiffs' federal claims. The court declines to

exercise its supplemental jurisdiction over the Plaintiffs' state law claims and REMANDS this

case to the St. Joseph County Superior Court. The Clerk of the Court is directed to effectuate the

remand of this case to the state court.

---

[1] In their Complaint the Plaintiffs spelled Kaser's name as "Kaiser," as did the
Defendants in their Answer. The correct spelling, as indicated in his deposition, is "Kaser," so
the court uses that spelling in this order.

[2] On March 23, 2016, the parties filed a stipulation of dismissal of Defendants Penn-
Harris-Madison School Corporation and Dr. Jerry Thacker (the superintendent of PHM).
Stipulation of dismissal with prejudice (DE 40). The remaining Defendants, then, include Eric
Kaser, John Kuhny, St. Joseph County Sheriff Mike Grzegorek, and the St. Joseph County Board
of Commissioners.

**BACKGROUND**

Plaintiff D. Scott Love brought this lawsuit on behalf of his minor son, D.L., a special needs student who attended Penn High School, part of the Penn-Harris-Madison School District.[3] At the time of the events giving rise to this lawsuit, D.L. was attending Penn and had in place "a written Student Individualized Education Program ("IEP") pursuant to the Individuals with Disabilities in Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq*. and applicable Indiana law." Complaint (DE 3), p. 3. There was also a Behavioral Intervention Plan ("BIP") in place that purportedly outlined how school officials should "respond to any behavioral outbursts[]" on the part of D.L. who, because of his special needs, would sometimes "make threatening statements, [engage in] inappropriate name-calling, and inappropriate remarks toward staff." *Id*. According to Love, "[t]his meant that response to any behavioral problems was to follow a precise protocol that was required to be known by and accessible to PHM staff." *Id.*

According to Love, on "April 15, 2014, at approximately 8:09 a.m., D.L. was standing and talking with other students in a school hallway. As [Defendant] Kaser, dressed in plain clothes and acting as [an] SRO,[4] passed by D.L., [D.L.] reached out and tapped him on the shoulder. Sgt. Kaser did not stop, offer a warning, or otherwise respond. D.L. then began walking

---

[3] Love filed his Complaint in the St. Joseph County Superior Court and the Defendants removed it to this court pursuant to 28 U.S.C. § 1441. *See* Docket at 1, Notice of Removal p. 2. The parties agree that this court has federal question jurisdiction over this case pursuant to 28 U.S.C. § 1331.

[4] "SRO" stands for school resource officer. According to the Defendants, "Penn High School utilized School Resource Officers . . . , which were typically police officers, who were present at the school to maintain safety of all individuals in the school." Defendants' Brief (DE 24), p. 3. It is undisputed that Kaser and Kuhny were both police officers who also worked at Penn as SROs.

backwards and making large arm gestures as he said 'What up?' to Sgt. Kaser. This did not interrupt the flow or attract the attention of students passing by." *Id*., p. 4. Later that same day, "at approximately 3:12 [p.m.]," D.L. was approached by Kaser and Kuhny in a school hallway. Love maintains that D.L. did not "make any movement that was threatening, quick, or aggressive." *Id*., p. 5. Nonetheless, according to Love, "Sgt. Kaser pointed his finger in D.L.'s face, [and] Sgt. Kuhny grabbed both of D.L.'s arms near his shoulders, pulling his arms out of the crossed over the chest position and pinning them behind D.L., while simultaneously pulling D.L. backward several steps. Sgt. Kuhny next spun D.L. around forcefully before pushing him backwards with his left hand, pointing at him, and then kicking him in the leg with his left foot." *Id*.

Love contends that while "D.L. was visibly agitated by the incident, the PHM staff did not follow his IEP–which would have provided for an opportunity to calm down–and instead simply put [D.L.] on the bus to go home." *Id*. D.L. recounted the incident to the bus driver, who responded by telling D.L. "that he had 'probably done something that he needed to be grabbed' and to 'take it like a man.'" *Id*., p. 6.[5] D.L. then responded by saying "at least I didn't kill him." *Id*. Love concedes that "D.L. talked about bringing a gun to school and then took his seat on the bus. The bus driver did not immediately report the incident or request assistance." *Id*.

Kaser and Kuhny met the next day with PHM administrators, during which Kaser allegedly "stated that he did not like D.L. and that D.L. gave him the 'willies.' Sgt. Kaser also

---

[5] On their face, the comments attributed to the bus driver might seem dismissive. But the videotape of the conversation between D.L. and the bus driver reveals that the driver made a sincere effort to calm D.L., shaking his hand, telling him he is "a good boy," and taking time to talk to D.L. about the encounter with Kaser and Kuhny. He also admonishes D.L. when D.L. talks about bringing a gun to school.

reported several undocumented issues with D.L.[6] After this meeting, Sgt. Kuhny went to the

Mishawaka Police Department and filed a complaint against D.L. for intimidation . . . ." *Id*. (This

allegation, it turns out, is not true, as discussed below.) "D.L. was arrested at Penn by the

Mishawaka Police Department[]" and "was charged with intimidation [although] the charges

were eventually dismissed." *Id*., pp. 6-7. Then, on September 18, 2014, shortly after "school

recommenced at Penn for the 2014-15 academic year . . . Sgt. Kaser and an unknown PHM staff

member falsely reported to PHM that D.L. had previously kept invading Sgt. Kaser's personal

space and that D.L. 'went after' Sgt. Kaser the morning of April 15, 2014[,] and again that

afternoon. . . . Sgt. Kaser has repeatedly displayed a disdain for D.L. and has manifested his

disdain in the form of physical violence against D.L." *Id*., p. 7. Love adds that "[t]his matter was

investigated by the Indiana Department of Education who [sic] found that PHM and various

individuals failed to follow D.L.'s IEP." *Id*.

Love contends that "[a]s a direct and proximate result of Defendants' conduct . . . D.L.

has sustained personal injuries; Plaintiffs incurred and will incur medical, hospital,

pharmaceutical, and/or therapeutic expenses; D.L. suffered and will suffer physical pain and

suffering, mental anguish, emotional distress, loss of enjoyment of life; sustained an impairment

of their ability to earn wages in the future; and Plaintiffs incurred other injuries and damages of a

personal and pecuniary nature." *Id*., pp. 7-8. Love, on behalf of D.L., asserts claims against the

---

[6] The Defendants contend that D.L. would "occasionally come up to the SROs on duty
and try to touch or grab their holstered firearms, sometimes hiding and shouting 'Bang! I got
you!' while pantomiming holding a gun. . . . These instances progressed to where D.L. would
approach the SROs and threaten to kill them." Defendants' Reply, p. 5. It is important to note,
however, that the Defendants do *not* contend that D.L. made any attempts to grab a firearm or
otherwise physically threaten Kaser or Kuhny on the day of the events giving rise to this lawsuit.

Defendants for a violation of the IDEA (*Id*., p. 8, Count I), a claim for violation of D.L.'s equal protection rights (*Id*., pp. 8-9, Count II), a claim for violation of D.L.'s procedural due process rights (*Id*., pp. 9-10, Count III), a claim for unreasonable seizure in violation of D.L.'s Fourth Amendment rights (*Id*., pp. 10-11, Count IV), a claim against Sheriff Grzegorek and Dr. Jerry Thacker for failure to train school resource officers "on how to preserve and maintain the constitutional rights of those with whom they came into contact[,]" (*Id*., pp. 12-13, Count VI), a state law claim for battery (*Id*., p. 14, Count VII), a state law claim for assault (*Id*., p. 15, Count VIII), a state law claim for false imprisonment (*Id*., pp. 14-15, Count IX), a state law claim for false arrest (*Id*., pp. 15-16, Count X), a state law claim for intentional infliction of emotional distress (*Id*., pp. 16-17, Count XI), a state law claim for negligent infliction of emotional distress (*Id*., p. 18, Count XII), and a state law negligence claim (*Id*., p. 19, Count XIII). The Plaintiffs' federal law claims are brought pursuant to 42 U.S.C. § 1983.

In their motion for partial summary judgment, the Defendants request that the court enter judgment in their favor "on the § 1983 federal claims against them in this case," which include Counts I, II, III, IV, V, and VI. Motion for Summary Judgment (DE 23), p. 1. The Defendants state that their "motion . . . does not address the state law claims," which include Counts VII through XIII. *Id*., p. 2.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the record shows that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict

for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party. *See id.* at 255. However, neither the "mere existence of some alleged factual dispute between the parties," *id.*, 477 U.S. at 247, nor the existence of "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), will defeat a motion for summary judgment. *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000).

Summary judgment is not a substitute for a trial on the merits nor is it a vehicle for resolving factual disputes. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Therefore, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate. *See Shields Enterprises, Inc. v. First Chicago Corp.*, 975 F.2d 1290, 1294 (7th Cir. 1992); *Wolf v. City of Fitchburg*, 870 F.2d 1327, 1330 (7th Cir. 1989). If it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his or her case, summary judgment is not only appropriate, but mandated. *See Celotex*, 477 U.S. at 322; *Ziliak v. AstraZeneca LP*, 324 F.3d 518, 520 (7th Cir. 2003).

## DISCUSSION

In their opposition brief, the Plaintiffs concede that the discovery process resulted in "insufficient evidence" to support Count I (violation of the IDEA), Count II (equal protection violation claim), or Count III (due process violation claim) of Plaintiffs' Complaint. Plaintiffs' Response, p. 12. The Plaintiffs do *not* concede their other federal claims, including their

unreasonable seizure claim asserted in Count IV, their excessive force claim asserted in Count V, or their failure to train claim asserted in Count VI. *Id.*, pp. 12-13. The Plaintiffs state that "[w]ith the exception of Counts I, II and II as noted above, Plaintiffs respectfully pray that the Court deny the County Defendants' Motion for Partial Summary Judgment as to Counts IV, V and VI." *Id.*, p. 14. Accordingly, summary judgment is GRANTED in favor of the Defendants as to Counts I, II, and III of the Plaintiffs' Complaint. As a result, Counts IV, V and VI are the only claims remaining that are subject to the motion for partial summary judgment.

### I. Count IV–Fourth Amendment unreasonable seizure claim.

The Plaintiffs contend that "sufficient evidence has been presented in the Statement of Material Facts along with the video tape evidence submitted herewith to establish that D.L. was the subject of a coordinated assault by Sgt. Kaser and Sgt. Kuhny that resulted in an unlawful seizure of D.L. . . . [T]he County Defendants have presented no evidence to justify that seizure of D.L. or the assaultive means with which the seizure took place." Plaintiffs' Brief, p. 12.[7] The Defendants contend that Love states no facts to support a Fourth Amendment unreasonable seizure claim. According to the Defendants, "[a]t best, Plaintiff has alleged that [Kaser and Kuhny] committed a state law battery upon D.L. (grabbing arms, pushing). Despite the fact that both SROs were county police officers, neither Kaser nor Kuhny arrested or handcuffed D.L. Absent a formal arrest, there can be no constitutional violation for a 'seizure' (no search has been alleged) or for excessive force." Defendants' Brief, p. 13. The Defendants go even farther,

---

[7] The Plaintiffs provided evidence in the form of a videotape that includes "surveillance coverage of the morning, afternoon and school bus events from April 15, 2014." Notice of Manual Filing (DE 43). The court has viewed the videotape several times and finds that it does not support the Plaintiffs' Fourth Amendment claim, as explained below.

pointing out that neither Kaser nor Kuhny "went to the Mishawaka Police Department the next day to report the statements made to the bus driver and file a complaint against D.L. for . . . making a threat . . . against a law enforcement officer . . . ; it was Mishawaka Police Officer Ryan Corbett who took it upon himself to file criminal charges. In fact, Kaser did not want to make a police report on it at all, but Corbett 'didn't feel it was right to just let it go.' As for Kuhny, he did not even know an arrest charge had been filed until after it occurred. . . . [N]either Kaser nor Kuhny arrested D.L. or filed criminal charges against him leading to the arrest." *Id.*, p. 8 (quoting Kaser Deposition (DE 42-5), pp. 60-61).[8]

The Defendants are correct. The evidence does not support the Plaintiffs' contention that Kaser's or Kuhny's actions rose to the level of "a coordinated assault . . . that resulted in an unlawful seizure of D.L." Plaintiffs' Brief, p. 12. The Plaintiffs maintain that "the County Defendants have presented no evidence to justify that seizure of D.L. or the assaultive means with which the seizure took place." *Id*. But this statement is a conclusion, as it assumes that the incident between D.L., Kaser and Kuhny on the afternoon of April 15, 2014, constituted a seizure in the first place, and ignores the Defendants' argument that it did not.

The court watched the videotape provided by the Plaintiffs. The afternoon encounter that is the basis for the Plaintiffs' unreasonable seizure claim (and assault and battery claims, but

---

[8] Based on these facts, the Defendants state that the Plaintiffs' allegations that Kuhny "went to the Mishawaka Police Department and filed a complaint against D.L.," and that Kuhny "maliciously misinformed the [police] as to the 3:12 p.m. encounter with D.L. . . ." are flat out wrong. Defendants' Reply, p. 9. Also, the Defendants argue that "[w]hile there might have been a legal issue if [Kaser or Kuhny] had *caused* D.L. to be arrested by a city police department (since they were county police officers, i.e., whether causally that might amount to the same thing because Kaser and Kuhny were also police officers), now it is clear that not even this happened." Defendants' Reply, p. 9.

those are not before the court) did not constitute a seizure. Here is how those events played out, according to the videotape evidence. Shortly after 8:00 a.m. on April 15, 2014, D.L. was standing in the school's main lobby talking with other students. Officer Kaser walks by, D.L. reaches out and pats Kaser on his right shoulder, Kaser looks at D.L. and then continues walking. D.L. then makes rude gestures behind Kaser's back. D.L. then walks away. That is the end of the morning encounter between D.L. and Kaser.

The videotape of the afternoon encounter–the encounter that is the crux of this suit–is also enlightening. Shortly after 3:00 p.m., when school was over for the day, D.L. is seen again in the lobby of the school near the front doors–standing with his arms crossed in front of his chest, a sweater or jacket draped over his left shoulder and carrying small backpack or book bag. Kaser approaches D.L. and begins talking to him while Kuhny walks up behind D.L. Kuhny then clasps D.L.'s biceps, D.L. lowers his arms, and Kuhny turns D.L. around about 180 degrees (in not an unduly forceful manner) in an attempt to get D.L. away from Kaser and direct him out of the school. D.L. reaches out toward Kaser with his right hand, although it is unclear whether D.L. makes contact with Kaser. Kaser then points to D.L. with an outstretched arm, seemingly directing him to leave the school or at least back away from the situation. (In fact, it is clear that Kuhny and Kaser were trying to diffuse the situation, which the parties agree began with a verbal exchange of some sort.) D.L. is obviously upset and continues to engage in a verbal exchange with the SROs (the videotape does not include audio). At one point D.L. and Kaser "chest bump" each other. The verbal exchange continues, then D.L. walks out the front doors of the school and heads to his bus. The entire confrontation lasted about one minute.

This entire incident was most unfortunate and the court does not doubt the Plaintiffs'
contention that D.L. was very distraught about it. This is understandable given that D.L. is a
special needs student with admitted behavioral problems, and D.L.'s conversation with the bus
driver reflected his level of consternation. Whether the confrontation with Kaser and Kuhny
amounts to actionable assault or battery under Indiana state law is not before the court–but the
event does not amount to an actionable Fourth Amendment claim for unreasonable seizure.

The Fourth Amendment prohibits unreasonable searches and seizures. U.S. Const.
Amend. IV. The Fourth Amendment's protections apply to arrests as well as to brief
investigatory stops . . . that fall short of traditional arrests. *United States v. Arvizu*, 534 U.S. 266,
273 (2002). "An officer's temporary detention of an individual . . . constitutes a seizure of a
person . . . and thus must be reasonable under the circumstances. *Huff v. Reichert*, 744 F.3d 999,
1004 (7th Cir. 2014). *See also*, *Still v. Indiana State Police*, 2016 WL 1270338, at *9 (N.D. Ind.
Mar. 31, 2016) (the Fourth Amendment guarantees citizens the right "'to be secure in their
persons . . . against unreasonable . . . seizures' of the person.") (quoting *Graham v. Connor*, 490
U.S. 386, 394 (1989)).

In the present case, the question is not so much whether the "seizure" of D.L. was
reasonable, but whether there was a seizure at all. The videotape evidence reveals there was not.
What occurred between D.L., Kaser and Kuhny on the afternoon of April 15, 2014, is fairly
characterized as a "confrontation" between the three. It could also be characterized as a very
minor "scuffle." But it cannot be characterized as a seizure, let alone an unreasonable one. The
Plaintiffs claim that the actions of Kaser and Kuhny constituted a "coordinated assault" that
"completely ignor[ed] D.L.'s fundamental right to be free from an unlawful and unjustified

seizure." Plaintiffs' Response, p. 8. Those are strong words indeed, but not accurate. Similarly, the Plaintiffs' contention that "Sgt. Kuhny grabbed both of D.L.'s arms near his shoulders, pulling his arms out of the crossed over the chest position and pinning them behind D.L., while simultaneously pulling D.L. backward several steps[,]" *see* Complaint, p. 5, ¶ 25, is also a rather hyperbolic spin on the events.[9] The Plaintiffs also state in their Complaint that Kuhny "next spun D.L. around forcefully before pushing him backwards with his left hand, pointing at him, and then kicking him in the leg with his left foot." *Id.*, ¶ 26. This statement is also a stretch. It is true that Kuhny is seen pushing D.L. away from him, although the degree of "force" used by Kuhny was minimal and occurred only after D.L. appears to confront Kuhny by moving toward him. As for the Plaintiffs' allegation that Kuhny kicked D.L., the videotape shows that at one point during the confrontation, Kuhny does move his left foot towards D.L.'s leg, although it is unclear whether Kuhny even made contact with D.L. The Plaintiffs' statement that Kuhny kicked D.L. conjures up an image of an adult–a police officer no less–battering a special needs student. But once again the language used by the Plaintiffs to describe the encounter overstates the actions of Kaser and Kuhny, as evidenced by the videotape of the incident. The Defendants' rhetoric isn't much better at some points. For example, the Defendants state that the afternoon incident was

---

[9] This language in the Plaintiffs' Complaint appears to have been taken, virtually verbatim, from a report prepared by the Indiana Department of Education, which investigated the April 15, 2014, incident. The Plaintiffs attached a copy of the report to their response brief (DE 42-4). The Defendants state that while they "have no objection to the filing of the video footage submitted by Plaintiff[,] . . . the Indiana Department of Education Report . . . , which contains someone's interpretation of what someone saw on the video, is hearsay and should be stricken from the record." Defendants' Reply, p. 8. The Defendants have not filed a motion to strike this exhibit, but it doesn't matter. The court agrees that the report is inadmissible hearsay and for that reason did not consider it. And, in any event, striking the report would achieve nothing, since the hearsay statements contained in it have already been incorporated into the Plaintiffs' Complaint and adopted as their own.

precipitated by D.L. "[coming] at Kaser with his arms crossed, into Kaser's 'personal space,' giving Kuhny the impression that D.L. would once again get within close proximity and try to grab a gun" since D.L. had allegedly tried to do that on other occasions. Defendants' Reply, p. 6 (quoting Kuhny deposition (DE 42-6), p. 36). Kuhny testified in his deposition that "all of a sudden, [D.L.] appears and he's freakin' hell bent on going after Kaser." *Id.*, p. 35. This description of the events also doesn't jibe with the videotape. For one thing, D.L. does not appear "all of a sudden." He is standing in the school lobby when Kaser and Kuhny approach *him*. Also, D.L. does not appear to "come at Kaser" in any way, let alone a threatening way, and at no point in the video (which the parties do not dispute captured the entirety of the encounter) does D.L. appear to be "freaking" about anything. In fact, apart from what appears to be a heated exchange of words, some finger pointing, and some "chest bumping," none of the participants appear to be unduly agitated during the encounter (although both Kaser and Kuhny acknowledged in their depositions that D.L. was upset during and after the incident). The entire encounter lasted about one minute, D.L.'s freedom of movement was not infringed (with the arguable exception of a few seconds when Kuhny grabs his arms to turn him away from Kaser), and the incident ended with D.L. walking out of the school by himself to catch his bus.

Obviously, the Plaintiffs and the Defendants present different subjective perceptions of what occurred and why it occurred, but these perceptions–and the rather inflammatory language used by both sides to articulate them–are of no moment to the court. These perceptions might be important with regard to the Plaintiffs' state law claims (to the extent that intent or credibility are issues in those claims, for example), but they are not relevant to the issues before this court. The resolution of the Plaintiffs' constitutional claims does not turn on credibility issues or a weighing

of evidence, which of course would be the sole province of a jury. The videotape provides sufficient undisputed evidence to establish that D.L. was not seized on April 15, 2014, and so his Fourth Amendment rights were not violated (and, in fact, were not even implicated). And, even assuming that D.L.'s very brief detention in the school lobby could be seen as a seizure, the evidence establishes that it was not an unreasonable one. Kuhny's actions were nothing more than an attempt to defuse the situation and direct D.L. away from Kaser and out of the school, which is what happened. Finally, it is undisputed that D.L. was not handcuffed, arrested, or otherwise denied freedom of movement. Not only was D.L. free to leave at any point during the encounter, he was being *encouraged* to do so by Kaser and Kuhny. This is the opposite of a seizure and the incident does not give rise to a cause of action for violation of D.L.'s constitutional rights.

> As the Supreme Court has explained:
>
> The reasonableness of limited seizures of the person recognized in *Terry* [*v. Ohio*] and its progeny rests on a balancing of the competing interests to determine the reasonableness of the type of seizure involved within the meaning of "the Fourth Amendment's general proscription against unreasonable searches and seizures." . . . We must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion. When the nature and extent of the detention are minimally intrusive of the individual's Fourth Amendment interests, the opposing law enforcement interests can support a seizure based on less than probable cause.

*United States v. Place*, 462 U.S. 696, 703 (1983) (quoting *Terry v. Ohio*, 392 U.S. 1, 20, 88 S.Ct. 1868, 1879 (1968)).  In the present case, the evidence reveals that any "seizure" of D.L. on April 15, 2014, was "minimally intrusive of [his] Fourth Amendment interests" and was supported by Kaser and Kuhny's interest in defusing a potentially volatile situation. The court concludes that there was no seizure of D.L. as a matter of law and, even assuming there was, it was minimally

intrusive, not unreasonable under the circumstances, and did not rise to the level of a Fourth Amendment violation. "If it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his or her case, summary judgment is not only appropriate, but mandated." *Celotex*, 477 U.S. at 322. That is the situation here and, accordingly, the Defendants are entitled to summary judgment in their favor on the Plaintiffs' claim of a Fourth Amendment violation for unreasonable seizure of the person.

**II. Count V–Excessive force claim.**

The Defendants argue that the Plaintiffs cannot pursue a Fourth Amendment excessive force claim for two reasons. First, the Defendants note that "neither Kaser nor Kuhny arrested or handcuffed D.L." (Defendants' Brief, p. 13) and claim that "[w]here there has been no formal arrest, there can be no claim for excessive force in violation of the Fourth Amendment." *Id.*, p. 15 (citing *Hemmer v. Vaughn*, 2005 WL 2372852 at * 3 (S.D.Ohio Sept. 27 2005)). This overstates the principle, since an excessive force claim can also arise out of a simple investigatory stop, *see Graham v. Connor*, 490 U.S. 386 (1989), which is more akin to what happened in this case. But the Defendants are correct that absent a seizure of some sort, there can be no basis for an excessive force claim. *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 843 (1998). Since the court has determined as a matter of law that D.L. was not seized in violation of his constitutional rights, he cannot pursue an excessive force claim and is left with his state law claims of assault and battery to redress his allegations that Kaser and Kuhny caused him physical and emotional harm.

For their part, the Plaintiffs argue that their claim for excessive force should survive summary judgment because "[a] trier of fact, in hearing all of the evidence in regard to the

assaultive seizure, the pinning of D.L.'s arms behind his back, being spun around, push[ed] and an attempted kick by the SRO could all fairly be determined to be excessive." Plaintiffs' Response, pp. 12-13. In fact, that is basically the entirety of the Plaintiffs' argument on this issue. Once again, however, the Plaintiffs' argument is premised on a legal conclusion. The Plaintiffs are assuming that D.L. was seized in violation of the Fourth Amendment, thereby providing a valid basis for an excessive force claim. Since the court has already determined that D.L. was *not* seized, he has no foundation for an excessive force claim. Again, no unreasonable seizure means no excessive force claim under the Fourth Amendment.

The Defendants' second argument–that the degree of force used by Kaser and Kuhny was objectively reasonable under the circumstances–is also supported by the undisputed evidence (which is to say, the videotape). Even assuming that the encounter between D.L. and the officers constituted a seizure, the Defendants are still entitled to summary judgment on this claim because the amount of force that Kaser and Kuhny used was quite clearly reasonable under the circumstances. As one court summarized recently, "'[i]n order to establish an excessive force claim under § 1983, plaintiffs must demonstrate that a state actor's use of force was 'objectively unreasonable' under the circumstances.'" *Jones v. Philips, et al.*, 2016 WL 3255022, at *3 (E.D. Wis. June 13, 2016) (quoting *Thomas v. City of Chicago*, 472 F.3d 444, 454 (7th Cir. 2006). . . . "An officer's use of force is unreasonable from a constitutional point of view only if, 'judging from the totality of the circumstances at the time of the arrest, the officer used force greater than necessary to make the arrest.'" *Gonzalez v. City of Elgin*, 578 F.3d 526, 539 (7th Cir. 2009) (quoting *Lester v. City of Chicago*, 830 F.2d 706, 713 (7th Cir. 1987)).

Just as the Plaintiffs failed to raise any genuine issue of fact regarding their seizure claim, they likewise fall short on their excessive force claim. The claim is based on the same allegations recounted in detail above, i.e., what the Plaintiffs referred to as the "coordinated assault" on D.L. by Kaser and Kuhny. The evidence, however, does not support the claim. The analytical framework the court follows to assess such claims is as follows:

> Where, as here, an excessive force claim "arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment . . . " *Graham v. Connor*, 490 U.S. 386, 394, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989). Determining whether force used to effect a seizure is "reasonable" under the Fourth Amendment[:]
>
>> requires a careful balancing of "'the nature and quality of the intrusion on the individual's Fourth Amendment interests'" against the countervailing governmental interests at stake . . . Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or an investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it.
>
> *Graham*, 490 U.S. at 396, 109 S.Ct. at 1871 (citations omitted). The test, in short, is one of "objective reasonableness," to be determined from the totality of the circumstances. *O'Toole v. Kalmar*, 1990 WL 19542 . . . (N.D.Ill.1990). *Because the governing test is objective, excessive force claims are "susceptible to summary judgment determinations . . . fewer cases should require a full-blown trial for resolution." Id.*

*Smith v. City of Joliet*, 809 F.Supp. 48, 49-50 (N.D. Ill. 1991), *aff'd*, 965 F.2d 235 (7th Cir. 1992) (italics added). The uncontroverted evidence in this case shows that the degree of force employed by Kaser and Kuhny against D.L. on April 15, 2014, was objectively reasonable under the circumstances of that encounter (or confrontation) and the Defendants are entitled to judgment as a matter of law on the Plaintiffs' Fourth Amendment excessive force claim.

### III. Count VI–Failure to train claim.

The Defendants' arguments regarding the Plaintiffs' failure to train claim rest on the same premise as their arguments regarding the Plaintiffs' unreasonable seizure and excessive force claims, to wit: the claim cannot be maintained since there was no underlying constitutional violation to support it. As the Defendants state it: "The Complaint states no operative facts with regard to [St. Joseph County] Sheriff Grzegorek. Count Six of the Complaint states only that the Sheriff . . . failed to properly train the school resource officers, without identifying what constitutional provision or federal law was violated." Defendants' Brief, p. 16. The Defendants also argue that "[a]n allegation of a 'failure to train' is available only in limited circumstances. To prevail, Plaintiff must show that the Sheriff's 'failure to train [his] employees in a relevant respect evidences a 'deliberate indifference' to the rights of students." *Id*., p. 17 (quoting *Cornfield by Lewis v. Consol. High Sch. Dist. No. 230*, 991 F.2d 1316, 1327 (7th Cir. 1993)).

The Plaintiffs' allegations regarding this claim include the following:

> Plaintiffs bring this claim pursuant to 42 U.S.C. § 1983 against Defendants, Sheriff Mike Grzegorek, individually and in his official capacity and Dr. Jerry Thacker, individually. Said Defendants were charged with training SROs and to train them on how to preserve and maintain the constitutional rights of those with whom they came into contact. Said Defendants['] failure to train SROs on the rights of students was tantamount to deliberate indifference to the rights of D.L. and other Penn students and the consequences of the failure to train were patently obvious. Said Defendant[']s failure to train resulted in the misconduct perpetrated by Sgt. [Kaser] and Sgt. Kuhny and thus in the resultant damages to Plaintiffs[.]

Complaint, p. 12, ¶¶ 68-71. In their brief, the Plaintiffs point out that "[i]n regard to any specific training that might have been provided to Sgt. Kuhny or Sgt. Kaser from Sheriff Grzegorek, both reported that they [had] received zero [sic] instruction from the Sheriff prior to assuming their duties as Special Resource Officers within the local schools in regard to physical contact with

students or any other training relative to dealing with students. This complete lack of any applicable training could be determined by the trier of fact to equate to a deliberate indifference to the rights of students and the actions of Sgt. Kaser and Sgt. Kuhny support that this indifference did result in the deprivation of D.L.'s constitutionally protected rights." Plaintiffs' Response, p. 13. Once again, the Plaintiffs' argument rests on the same faulty premise–the incorrect legal conclusion that D.L.'s constitutional rights were violated as a result of what they contend was an unconstitutional seizure and an unconstitutional use of force. Since this is not the case, the Plaintiffs cannot pursue a failure to train claim.

The Plaintiffs' failure to train claim against Sheriff Grzegorek is brought pursuant to *Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978).[10] As the Defendants correctly point out,

---

[10] A housekeeping point is necessary here. In their reply brief, the Defendants state that they "included the Saint Joseph County Commissioners in their Motion for Partial Summary Judgment, and then forgot to mention them. The argument for Sheriff Grzegorek that no *Monell* claim is stated in the Complaint would apply to the County Commissioners as well . . . ." Defendants' Reply, p. 2, n. 1. The Defendants then argue that "as a governmental entity, the Board of County Commissioners is an improper party to this claim[]" since "Indiana sheriffs and their deputies are not subject to the authority of the county commissioners of the county where they hold office." *Id.* (citing *Radcliff v. County of Harrison*, 627 N.E.2d 1305, 1306 (Ind. 1994)) (additional citations omitted). It is well established that there is no agency relationship between a county or its board of commissioners and the sheriff. *Delk v. Board of Commissioners of Delaware Co.*, 503 N.E.2d 436, 440 (Ind.Ct.App. 1987). For these reasons, the Defendants argue that "the St. Joseph County [Board of] Commissioners [is] an improper party to respond to the claims in this case." Defendants' Reply, p. 2, n. 1. All of this is true with regard to the Plaintiffs' federal claims, including their *Monell* claim, but that does not entitle St. Joseph County to summary judgment in this case, since the Plaintiffs have not asserted a *Monell* claim, or any other federal claim, against the County. The Plaintiffs' *Monell* claim is asserted *only* against Sheriff Grzegorek and Dr. Thacker (the latter of whom, of course, is no longer a defendant in this case). The Plaintiffs do not even mention the County in their failure to train count. In fact, in their Complaint, the Plaintiffs expressly state that "[t]he Saint Joseph County Board of Commissioners . . . is named as a party herein under *respondeat superior* for the state law claims against Sheriff Grzegorek, Sgt. Kuhny, and Sgt. Kaser." Complaint, p. 2, ¶ 12. Therefore, the claims before the court now do not implicate the County. The County, then, remains a defendant in this case as to the Plaintiffs' state law claims.

"[t]o establish municipal liability under § 1983 . . . a plaintiff must present sufficient evidence to show that the constitutional violation resulted from a municipal policy, custom, or practice. . . . 'Misbehaving employees are responsible for their own conduct; units of local government are responsible only for their policies rather than misconduct by their workers.'" Defendants' Brief, pp. 16-17 (citations omitted). The Plaintiffs "evidence" on this issue consists of one fact and one legal conclusion, to wit: neither Kaser nor Kuhny received any specific training from the sheriff's department prior to serving as SROs, and this lack of training resulted in the deprivation of D.L.'s constitutional rights. The Plaintiffs' claim fails since the second element–a root constitutional deprivation–is not present in this case. As another district court recently noted, "the Seventh Circuit has stated specifically that 'there can be no liability under *Monell* for failure to train when there has been no violation of the plaintiff's constitutional rights.'" *Harris v. City of Chicago*, 2016 WL 3261522, at *3 (N.D. Ill. June 14, 2016) (quoting *Jenkins v. Bartlett*, 487 F.3d 482, 492 (7th Cir. 2007)); *see also Sallenger v. City of Springfield, Ill.*, 630 F.3d 499, 504 (7th Cir. 2010) (municipality cannot be liable under *Monell* for a failure to train when there is no underlying constitutional violation by an employee); *Alexander v. City of South Bend*, 433 F.3d 550, 557 (7th Cir. 2006) (same). Since D.L. suffered no constitutional deprivation he cannot maintain a failure to train claim against Sheriff Grzegorek.

**IV. Remand to state court.**

Given that all of the Plaintiffs' federal claims must be dismissed, the only basis remaining for this court's jurisdiction over the Plaintiffs' state law claims is federal supplemental jurisdiction under 28 U.S.C. § 1367. District courts have the discretion to exercise supplemental jurisdiction, even after all federal claims have been dismissed, or to remand the case to the state

court in which it originated. *Brooks-Albrechtsen v. City of Indianapolis*, 2016 WL 3213457 (S.D. Ind. June 9, 2016). As the court explained in *Brooks-Albrechtsen*:

> [Section 1367] explains that "district courts may decline to exercise supplemental jurisdiction . . . if . . . the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. 1367(c)(3); *Williams Elec. Games, Inc. v. Garrity*, 479 F.3d 904, 906 (7th Cir. 2007) ("subsection (c)(3) expressly authorizes the district judge to dismiss a supplemental claim when the federal claims have dropped out of the case"). Further, the Seventh Circuit has noted that the purpose of supplemental jurisdiction is "economy in litigation" and has instructed that "if the federal claims drop out before trial, the district court should relinquish jurisdiction over the state-law claims," given that federal judicial resources had not yet been utilized. *Id*. at 906-07 (emphasis omitted); *Hankins v. Dunkle*, 2015 WL 500844, at *6 (S.D. Ind. Feb. 4, 2015).

*Id*. at * 5; *see also Al's Serv. Ctr. v. BP Prods. N. Am., Inc.*, 599 F.3d 720, 727 (7th Cir. 2010) ("[w]hen all federal claims in a suit in federal court are dismissed before trial, the presumption is that the court will relinquish federal jurisdiction over any supplemental state-law claims."). This is so for several reasons, which include the goals of  "minimizing federal intrusion into areas of purely state law," *Khan v. State Oil Co.*, 93 F.3d 1358, 1366 (7th Cir. 1996), and "respect[ing] . . . the state's interest in applying its own law, along with the state court's greater expertise in applying state law[.]" *Huffman v. Hains*, 865 F.2d 920, 923 (7th Cir. 1989). There are exceptions to this presumption, and a district court might decide to exercise supplemental jurisdiction when, for example, "significant federal judicial resources have already been expended to decide the state claims, or when there is no doubt about how those claims should be decided." *RWJ Management Co. v. BP Products North America*, 672 F.3d 476, 481 (7th Cir. 2012) (citations omitted).

This case has been pending in this court since the Defendants removed it here on November 21, 2014. Less than nine months later, on August 12, 2015, the Defendants filed the

present motion for partial summary judgment, which is the only substantive motion the court has had to address. Briefing on the motion was delayed between the filing date and the completion of briefing on April 18, 2016, but that was the result of procedural matters and not due to any innate complexities in the case or other substantive issues. In other words, with the exception of this Opinion and Order, the court has expended little in the way of judicial time or resources in this case. Also, the court has not addressed the Plaintiffs' state law claims at all and so cannot conclude that their resolution "is absolutely clear." The state court is better qualified to resolve the remaining claims and this court therefore declines to exercise its supplemental jurisdiction over those claims.

## CONCLUSION

For the reasons discussed above, the motion for partial summary judgment filed by Defendants (DE 23) is GRANTED as to all of the Plaintiffs' federal claims. The court declines to exercise its supplemental jurisdiction over the Plaintiffs' state law claims and REMANDS this case to the St. Joseph County Superior Court. The Clerk of the Court is directed to effectuate the remand of this case to the state court.

Date: June 23, 2016.

　/s/　William C. Lee　
William C. Lee, Judge
U.S. District Court
Northern District of Indiana